IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| D&S INVESTMENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 09-1091-CV-W-HFS |
| | ) | |
| NABY VINCENT D'METAYER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM TO THE PARTIES**

This default proceeding against an elusive entity, CT Matrix (UK) Ltd. ("CT Matrix") is based on an investment by plaintiff of some $1 million in September 2008. The investment was in the interest component of a bundle of mortgages with a face value of $295 million. According to plaintiff's owner, Sean Tebbe of Jackson County, Missouri, the one-year investment, when placed in the hands of an overseas manager, P.W. Bush, Ltd., was to produce annual interest payments on coupons totaling $408,000, and profits from investments of over $37 million. None of these surprising sums have been paid, the instrument has not been returned, as was promised, and there is an Internet indication that the management entity has been "dissolved."

CT Matrix, together with plaintiff (D&S) were parties to a consortium agreement with William Kent, Ltd. (also a named defendant but unserved), with CT Matrix being "consortium manager". Although the file contains proof of overseas service on CT Matrix in an unstated manner, and the court has found good service on the uncontested record, there was evidence from Tebbe that in a 2009 trip to the Orient he was unable to find employees or representatives of CT Matrix at the address supplied, but rather a secretarial service with no known connection with CT Matrix. Recent mailings from the Clerk's office seeking signatures of recipients have been returned as

undeliverable.[1]

Plaintiff's claim to $37 million in profits to be earned by P.W. Bush, from a one year investment in financially depressed period, does not appear to be supported by proof of actual earnings, but rests rather on alleged promises or projections by CT Matrix. Documentary proof submitted by plaintiff is an e-mailed schedule (Exh. 29) and a claimed signed acknowledgment of unspecified money due (Exh. 42).[2] I take judicial notice of the individual defendants' *pro se* answer in the companion case, which has a contention that the Disbursement Table was stated to be "for illustration only" (Chen answer, ¶ 63). Those words do not appear in the document attached to Exh. 29, if that is the reference, but the document is entitled "Expected Disbursement" and is thus arguably not promissory in nature.

While it seems ludicrous to suppose that an investment will produce a 3700% profit in 12 months during a severe recession, I remain open to further proof of either a promise or of actual profits. A default judgment for such a sum is not appropriate, however, based on what I have heard

---

[1] It may be useful for plaintiff to pursue service on the investment manager or any successor and the party alleged to be in the consortium with plaintiff and CT Matrix, in order to sort out real parties who may have made agreements with plaintiff or may have control over property belonging to plaintiff – assuming the $1 Million has not disappeared into thin air. Filings by defendant banks in companion litigation in this District suggest some transferred property may exist. Two individuals who have an unexplained relationship with CT Matrix have also been sued but not served in this proceeding. They have filed *pro se* answers in companion litigation in this court, which may suggest their pockets are empty. I also note a London registry of an address for CT Matrix, as well as a Las Vegas address. In order to avoid wasting time with questionable service, I suggest duplicate service at the registered office in London.

[2] The plaintiff's handwritten requirement that a condition of a new agreement would be "disbursement under Consortium Agreement dated October 20, 2008" by December 25, 2009, is not initialed by Mr. Chun, purportedly on behalf of William Kent (consortium partner) and CT Matrix. Although there is some testimony that signing was subsequent to the insertion I am currently unpersuaded. Standard world-wide practice, I assume, would be initialing an insertion to show consent. That did not occur.

and the documents I have examined. Default judgments are serious judicial matters, not to be entered on a loose say-so. Oral argument and further briefing will be allowed or I would accept more evidence in support of plaintiff's theory.

The claim for $408,000 in periodic interest payments is also very difficult to credit, but could be supported if Mr. Tebbe's testimony has some documentary verification. It is not credible that he was told he would receive monthly payments of $8,500 in some months and $17,000 in alternate months without at least some contemporaneous notes of representations to that effect. I find none, although they may exist. Even if this is based solely on telephone conversations without even e-mail confirmation, I cannot believe that the participant in a business conversation would not at least write and keep some notation of these significant figures. The record remains open for documentation of past recollection recorded or further explanation and argument.

It may be useful to refer to several other problems, aside from the absence of any written specification of interest payments to be received and the arguable absence of writings showing promised profits or actual earnings from investments to be made by the Fund Manager. Apparently plaintiff was to share profits on a 50/50 basis with the other entities in the Consortium (the reason for such surprising generosity is unknown). Ext. 56. And the Pay Directive (Ext. 19) has a limitation, "subject to the availability of sufficient funds", surreptitiously concealed on page 3 in the "Affidavit Acknowledgment" signed by Mr. Sang.

Having already ordered return of the instrument it would be consistent to give some relief if there are earnings floating around somewhere. This does not seem to have been a target of the presentation made at the default hearing. Perhaps the plaintiff's case would be helped by further information from the various named defendants, some of whom have been served in the companion

litigation. I am filing this memorandum to explain why, on the present record, and with the rather limited arguments I have heard, I am not comfortable in assessing sums for recovery. In a court-tried case, however, I am free to leave the record open so that all appropriate relief can be given to a party who appears to have been snookered.

/s/ Howard F. Sachs
HOWARD F. SACHS
Senior United States District Judge

August  19 , 2011

Kansas City, MO